UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GERSU GUISAO,

    Petitioner,

v.

    Case No. 8:15-cv-9-MSS-AAS

SECRETARY, DEPARTMENT OF
CORRECTIONS,

    Respondent.
_____/

**O R D E R**

An earlier order dismissed as time barred Guisao's petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state court conviction for sexual battery on a minor. (Doc. 10) The court of appeals affirmed. (Docs. 16 and 18) The earlier order determined that Guisao failed to demonstrate actual innocence to excuse the time bar but stated that Guisao could move for post-judgment relief if he later obtained evidence supporting his actual innocence claim (Doc. 10 at 8) (citations omitted):

> Guisao fails to meet the actual innocence exception to the limitation and, as a consequence, review of the petition is barred. Guisao may move under Rules 59(e) or 60(b), Federal Rules of Civil Procedure, to re-open this action if he acquires an affidavit, sworn under the penalty of perjury, from Dr. Willey or the victim. To qualify for the "actual innocence" exception to the limitation, the affidavit must contain "new" evidence (1) that is proof of Guisao's "factual innocence" and (2) that, "in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt."

Over two years later, Guisao moves (Doc. 23) for relief under Rule 60(b) and moves (Doc. 26) for appointment of counsel. He submits affidavits by Dr. Edward Willey and other witnesses and requests an evidentiary hearing to prove his actual innocence. (Docs. 23

1

at 15–19 and 23-1 at 34–36, 54–72) The Respondent files a response and an appendix containing the relevant state court record (Docs. 27 and 32), and Guisao files a reply. (Doc. 34)

"The Supreme Court held [ ] that a Rule 60(b) motion is to be treated as a successive habeas petition if it: (1) 'seeks to add a new ground of relief;' or (2) 'attacks the federal court's previous resolution of a claim *on the merits*.'" *Williams v. Chatman*, 510 F.3d 1290, 1293–94 (11th Cir. 2007) (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005)) (italics in original). "Where, however, a Rule 60(b) motion 'attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings,' the motion is not a successive habeas petition." *Williams*, 510 F.3d at 1294 (quoting *Gonzalez*, 545 U.S. at 532).

In his Rule 60(b) motion, Guisao argues that actual innocence excuses the time bar. (Doc. 23 at 5–7, 19–21) Because actual innocence is not a claim that challenges the state court judgment and instead "serves as a gateway through which a petitioner may pass . . . [the] expiration of the statute of limitations," the Court does not construe his Rule 60(b) motion as a second or successive petition. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). *Herrera v. Collins*, 506 U.S. 390, 390–91 (1993) ("[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the course of the underlying state criminal proceedings."). *Gonzalez*, 545 U.S. at 533 ("When no 'claim' is presented, there is no basis for contending that the Rule 60(b) motion should be treated like a habeas corpus application. If neither the motion itself nor the federal judgment from which it seeks relief substantively

2

addresses federal grounds for setting aside the movant's state conviction, allowing the motion to proceed as denominated creates no inconsistency with the habeas statute or rules.").

However, Guisao's Rule 60(b) motion is untimely. Under Rule 60(b)(2), a party may seek relief from a final order for "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." However, the party must file a motion under Rule 60(b)(2) no later than one year after the final order enters. Fed. R. Civ. P. 60(c)(1) ("A motion under Rule 60(b) must be made within a reasonable time — and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.").

The order dismissing the petition entered on March 26, 2018 (Doc. 10), and Guisao placed in the hands of prison officials for mailing his Rule 60(b) motion supported by new evidence on August 31, 2022. (Doc. 23 at 1) Because his motion under Rule 60(b)(2) is untimely, this Court lacks jurisdiction to review the motion. *United States v. Murray*, 477 F. App'x 545, 546 (11th Cir. 2012)[1] ("Murray's Rule 60(b)(3) motion was untimely, since it was filed more than one year after the conclusion of her trial. The district court therefore lacked jurisdiction to consider it."); *Paul v. William Morrow and Co., Inc.*, 380 F. App'x 957, 959 (11th Cir. 2010) ("Even construing Paul's brief liberally, the court also lacked jurisdiction to grant relief under Rule 59(e) or Rule 60(b)(2) because she did not file her motion within the applicable time limits.").

Even if the Rule 60(b) motion is timely, Guisao fails to demonstrate actual innocence. "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the

---

[1] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin*, 569 U.S. at 386 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). "To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324. "'[T]he habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.'" *Rozzelle v. Sec'y, Fla. Dep't Corrs.*, 672 F.3d 1000, 1017 (11th Cir. 2012) (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)).

**Evidence at Trial**

The jury found Guisao guilty of sexual battery, as charged in Count One of the information. (Doc. 32-2 at 61) The information alleged in Count One that Guisao penetrated E.L.'s anus with his penis or placed his penis in contact with E.L.'s anus. (Doc. 32-2 at 15–16)

At trial, E.L.'s mother testified that Guisao fathered E.L. and, shortly after, Guisao and E.L.'s mother ended their brief relationship. (Doc. 32-2 at 240–41) On May 1, 2005, E.L.'s mother picked up E.L., who was five, after E.L. visited Guisao for the weekend. (Doc. 32-2 at 241–42) E.L. appeared scared and sad. (Doc. 32-2 at 244–45) E.L.'s mother asked E.L. why she was sad, and E.L. put her head down and said that her butt hurt. (Doc. 32-2 at 245–46) E.L. said that Guisao "got his tota" and "pushed hard on [her] butt." (Doc. 32-2 at 246) "Tota" is a Spanish word that E.L.'s mother used with E.L. to describe her

vagina. (Doc. 32-2 at 246) When E.L. felt pain and started to cry, Guisao told her to remain quiet because he did not want his mother to hear E.L. (Doc. 32-2 at 248) E.L. described Guisao's penis as "big and hard." (Doc. 32-2 at 249) E.L.'s mother had never described a penis to E.L. (Doc. 32-2 at 246–47)

After E.L. and E.L.'s mother returned home, E.L.'s mother asked E.L. again what happened and E.L. responded (Doc. 32-2 at 250):

> [E.L.'s mother:] [S]he said that, you know, she was [in] his bedroom again and that she was watching a movie and she was laying down and she had underwear on. He was lying next to her and that he took her panties off and that he licked his finger and put it on her butt and then that he pressed hard with his tota into her butt and she kept repeating mommy, it hurts, I can't sit down, have to poop, and I can't poop, my tummy hurts and that I cried and that he kept saying shush, I don't want my mom to listen to you, to hear you and then he said, I'm sorry.

E.L.'s mother immediately called the police. (Doc. 32-2 at 250) A sheriff's deputy collected the panties that E.L. was wearing and a comforter and bedsheets from Guisao's home. (Doc. 32-2 at 251–52, 277, 280–81, 285) A sheriff's deputy obtained oral swabs from E.L. and from Guisao. (Doc. 32-2 at 294–95, 296–97)

E.L., who was seven at trial, testified and described what happened in Guisao's bedroom (Doc. 32-2 at 266–67):

> [Prosecutor:] What happened in your dad's bedroom that day?
>
> [E.L.:] When I was watching the [television], he, um, — I didn't notice that he was licking his fingers, but he was not eating, he was licking his fingers, then he put his pants

5

|  |  |
|---|---|
|  | down and his underwear down and he, um, licked his front private part, then I didn't know he was taking my pants off and then he, um, put his front part in my butt and I didn't like it, so I yelled. |
| [Prosecutor:] | You yelled? |
| [E.L.:] | Yes. |
| [Prosecutor:] | Why did you yell? |
| [E.L.:] | Um, I yelled, um, his mom to come here. |
| [Prosecutor:] | And did he say anything after you yelled? |
| [E.L.:] | Yes. He said be quiet and he covered my mouth with his hand. |
| [Prosecutor:] | What did his front part look like? |
| [E.L.:] | I don't know. |
| [Prosecutor:] | You don't remember? |
| [E.L.:] | Yes. |
| [Prosecutor:] | You said you had panties on that day? |
| [E.L.:] | Yes. |
| [Prosecutor:] | Did he take your panties off? |
| [E.L.:] | Yes. |
| [Prosecutor:] | Did you feel his front part touch your butt? |
| [E.L.:] | Yes. |
| [Prosecutor:] | His skin touching your skin? |
| [E.L.:] | Yes. |
| [Prosecutor:] | And you told us it hurt. Anything else you remember about how that felt? |

6

| | |
|---|---|
| [E.L.:] | No. |
| [Prosecutor:] | Do you know that your butt has an inside and outside, do you know if it went inside your butt, do you know what I mean by that? |
| [E.L.:] | Yes. |
| [Prosecutor:] | Do you know whether his front part went inside your butt? |
| [E.L.:] | I don't know. |
| [Prosecutor:] | But you felt it touching your butt? |
| [E.L.:] | Yes. |
| [Prosecutor:] | Did he stop? |
| [E.L.:] | Yes. |
| [Prosecutor:] | What happened when he stopped? |
| [E.L.:] | Um, then he put his pants up. |

On cross-examination, E.L. testified that Guisao's penis penetrated her anus (Doc. 32-2 at 271–72):

| | |
|---|---|
| [Trial counsel:] | When [Guisao], when he put his tota on your butt and pressed down hard and it hurt, do you remember that? |
| [E.L.:] | Yes. |
| [Trial counsel:] | Do you remember that you said that it went inside your butt hole? |
| [E.L.:] | Yes. |
| [Trial counsel:] | Okay. So, tell — you're comfortable today saying it actually went inside the butt hole, right? |
| [E.L.:] | Yes. |

7

| | |
|---|---|
| [Trial counsel:] | Do you remember when the police officer went to your house at your mom's house, do you remember them coming and talking to you there? |
| [E.L.:] | Yes. |
| [Trial counsel:] | Do you remember where you were when you took your panties off, what room? |
| [E.L.:] | I was in the living room. |
| [Trial counsel:] | In the living room, okay. And you don't remember any warm juice or liquid, water — when [Guisao] put his tota on your butt and pressed down real hard, you don't remember any warm water or cream, or anything like that, that came out on your butt, you don't remember that? |
| [E.L.:] | I mean no. |

A nurse practitioner who worked for the Child Protection Team testified that she examined E.L. on May 2, 2005, at 8:15 A.M. (Doc. 32-2 at 307, 309) E.L. told the nurse that Guisao put his finger in her butt, "put his thing" in her butt, and pushed really hard until she cried. (Doc. 32-2 at 311) The nurse testified that DNA evidence of sexual abuse does not remain on a child for longer than nine hours (Doc. 32-2 at 304–06):

| | |
|---|---|
| [Nurse:] | Basically there's sort of a known kind of thing with adults that if the assault occurs within seventy-two hours, they're brought in immediately for an exam to collect any type of DNA that may still be on the adult. In children it's a little bit different because they don't have the proper mechanisms to keep sperm alive on them. |
| [Prosecutor:] | Can you explain that from basically a lay standard how an adult body differs from a child's body [ ] forensically? |

8

| | |
|---|---|
| [Nurse:] | Well, people know, especially people who are trying to get pregnant you have proper cervical mucus to keep the sperm alive to be able to reproduce. Children don't produce cervical mucus until they reach puberty, so they don't have the proper cervical mucus. Their PH in their vaginas and their anal areas is different than that of an adult; their temperature is a little bit different, so sperm doesn't stay alive very long in children. It's not designed that way. |
| [Prosecutor:] | And you just talked about cervical, we're talking about a vaginal, what about the issue of the anus if the assault allegedly occurred anally or around the anus? |
| [Nurse:] | Well, the anus isn't designed to keep sperm alive for reproductive purposes. |
| [Prosecutor:] | What ages of children do you see? |
| [Nurse:] | Zero to eighteen. |
| [Prosecutor:] | And you said that there's a seventy-two-hour window that's generally accepted with adults. With children is there a generally accepted number of hours that the scientific community accepts that is a reasonable amount of time before you would have a much less likely chance of recovering any type of DNA evidence? |
| [Nurse:] | Generally, they say that after nine hours you won't recover it on a child. |

Because more than nine hours passed since the sexual abuse, and E.L. brushed her teeth, washed and wiped her genitals, urinated, and had a bowel movement, the nurse did not collect swabs from E.L. (Doc. 32-2 at 313–14, 335, 338–39)

The nurse examined E.L.'s vagina and anus and did not observe injuries, redness, or bruising. (Doc. 32-2 at 318–19) Also, the nurse did not observe seminal fluid in E.L.'s vagina

9

and anus. (Doc. 32-2 at 338) The nurse opined that the lack of physical injury is consistent with anal penetration (Doc. 32-2 at 319):

| | |
|---|---|
| [Prosecutor:] | Okay. And because of what you saw physically, what you've just described to us, is that inconsistent with the history that the child gave you in terms of, she saying that a penis had been placed against her anus and he pushed hard? |
| [Nurse:] | No, it's not inconsistent. There are very rarely any anal findings. |
| [Prosecutor:] | And why is that? |
| [Nurse:] | Because the anus is designed to expand as a circular muscle that accommodates a bowel movement that is larger than the diameter of a penis and it heals very quickly, so rarely there are any findings. In fact, I think [ ] out of my entire history with the Child Protection Team, I've seen anal findings once [—] out of all of the assaults we've examined. |
| [Prosecutor:] | So, specifically the fact that the child did not present with any physical injuries to her anus does not indicate to you that a sexual assault did not occur? |
| [Nurse:] | No. |
| [Prosecutor:] | And I think you've already testified that it's very common not to see injuries? |
| [Nurse:] | Yes, it is. |

A forensic examiner discovered two areas inside the crotch of E.L.'s panties that preliminarily tested positive for semen. (Doc. 32-2 at 378, 380–82) The examiner extracted low levels of DNA from both areas and observed with a microscope a sperm head in one of the areas. (Doc. 32-2 at 382–83) The area contained a mixture of DNA with an extremely

high concentration from one contributor and an extremely low concentration from a second contributor. (Doc. 32-2 at 384–85) The DNA from the major contributor matched E.L.'s DNA, and the extremely low contributor matched a male's DNA. (Doc. 32-2 at 385)

A DNA analyst conducted YSTR testing, developed a partial profile containing eleven of twelve locations in the male DNA, and determined that Guisao's DNA matched the eleven locations (Doc. 32-2 at 416–21):

| [Prosecutor:] | Specifically how many locations do you look at on the genetic blueprint when you're trying to develop a profile on YSTR? |
|---|---|
| [Analyst:] | Twelve locations. |
| [Prosecutor:] | And did you develop a profile from the Exhibit PAB 51300 that came from the Hillsborough County Sheriff's Office that was worked on by Miss Bencivenga? |
| [Analyst:] | Yes, I was able to develop a partial profile. |
| [Prosecutor:] | What does that mean? |
| [Analyst:] | That means I was not able to obtain a complete profile, so [—] refer to my notes again [—] at all but one location I was able to obtain a DNA result. |
| [Prosecutor:] | And is it uncommon that when you're trying to develop a DNA profile, especially from [—] not from something where somebody's taken a buccal swab from somebody but it's an item from a crime scene, is it unusual that sometimes you can't develop a whole profile? |
| [Analyst:] | No, it's not unusual, you simply might [not] have enough DNA present. |

| | |
|---|---|
| [Prosecutor:] | In fact, are there some cases where you can only develop, two, three, four locations? |
| [Analyst:] | That's correct; I have seen that before. |
| [Prosecutor:] | Would your testimony be [ ] that if you are excluded even at a single location then you are excluded at all? |
| [Analyst:] | It only takes one location to exclude somebody. |
| [Prosecutor:] | And in fact an exclusion means that is a definitive statement that [ ] the known sample is not the source of the questioned samples? |
| [Analyst:] | That is correct. |
| [Prosecutor:] | And all but one I think you said you developed on this particular item from the parents, all but one location? |
| [Analyst:] | That is also correct. |
| [Prosecutor:] | Is there any way you can account for that in terms of why you might not be able to see a full profile? |
| [Analyst:] | I would not be able to say the exact reason but one reason may be [that] we simply did not have enough male DNA present to develop a full profile. |

. . .

| | |
|---|---|
| [Prosecutor:] | And with respect, let me ask you first, these locations, it's called locus, but I think that collectively they're called loci? |
| [Analyst:] | That's correct. |
| [Prosecutor:] | It's points on the DNA chain or addresses on the genetic blueprint that you're looking for? |

12

[Analyst:]     I just like to call them locations.

[Prosecutor:]     And they have these numerical addresses, but that's really all they are, is locations.

[Analyst:]     Location on the Y chromosome.

[Prosecutor:]     And he matches at everything except the DYS 19 which shows on your result as a no result; is that correct?

[Analyst:]     Yes, that is correct.

[Prosecutor:]     And that is not an exclusion?

[Analyst:]     No, we just simply did not obtain a result at that location.

[Prosecutor:]     You did not see that particular location, the result there?

[Analyst:]     That's correct.

[Prosecutor:]     And a low level of DNA might account for that?

[Analyst:]     Yes, that is correct.

. . .

[Prosecutor:]     And again I think you've already said to us that an exclusion at one is an exclusion at all?

[Analyst:]     That is correct.

[Prosecutor:]     But with respect to the known sample of Mr. Gersu Guisao, he is a match at all locations except the one you could not see?

[Analyst:]     Yes.

13

Guisao testified and denied sexually battering E.L. (Doc. 32-2 at 443–44) He contended that, on May 1, 2005, E.L. slept with her grandmother. (Doc. 32-2 at 440) In April, Guisao had engaged in sex with his girlfriend in his bedroom and ejaculated on his sheets and his underwear. (Doc. 32-2 at 442–43) He contended that police officers collected a comforter and bedsheets from his bedroom and dirty underwear belonging to him and to E.L. and placed all the items in one bag. (Doc. 32-2 at 438–39)

In rebuttal, a sheriff's deputy testified that he collected E.L.'s underwear from E.L. at her home and packaged the underwear in a bag. (Doc. 32-2 at 459) The deputy collected the bedsheets and comforter from Guisao's home and packaged the bedsheets and comforter in separate bags. (Doc. 32-2 at 459–60) The deputy did not collect any other items. (Doc. 32-2 at 460)

### "New" Evidence on Federal Habeas

To prove actual innocence, Guisao submits an affidavit by Dr. Willey (Doc. 23-1 at 34–36) and fifteen affidavits by family and friends. (Doc. 23-1 at 54–72) Dr. Willey, who practices pathology and forensic medicine, disagrees with opinions by the nurse practitioner who testified at trial. (Doc. 23-1 at 34–35) Dr. Willey opines that: (1) a doctor or nurse may collect semen from a child more than nine hours after a sexual battery because an examiner may detect DNA even if the sperm is not alive, (2) a doctor or nurse must collect both sperm and seminal fluid because an examiner may detect male sexual contact from seminal fluid even many years later, (3) damage to the anus from sexual intercourse occurs in one in five thousand cases, and (4) the nurse failed to use available techniques to determine whether injury to the victim's anus occurred. (Doc. 23-1 at 35)

In an affidavit, Yaimi Guisao, who is Guisao's niece, states that, after Guisao began to serve his prison sentence, Yaimi observed E.L. act fearfully around her mother. (Docs. 23 at 16 and 23-1 at 54) E.L. told Yaimi that her mother beat her and threatened her if she spoke about Guisao. (Doc. 23-1 at 54) E.L. told Yaimi that she became upset and angry when her mother took her to court to change her last name. (Doc. 23-1 at 54–55) Also, E.L. told Yaimi that "when she was eighteen, she knew what she had to do, but didn't know how because she didn't want her [mother] to get in trouble." (Doc. 23-1 at 55)

In an affidavit, Olivia Laguna states that she appeared for trial prepared to testify. (Doc. 23-1 at 57) Laguna states that Guisao pressed charges against E.L.'s stepfather because E.L. accused her stepfather of inappropriately touching her. (Doc. 23-1 at 57–58) E.L.'s mother told Laguna that "she would make [Guisao] pay for what he did to her husband," and "less than a year later [Guisao] was pressed with this charge." (Doc. 23-1 at 58) Laguna states that E.L. told her that "it wasn't right that [E.L.'s mother] pressured [E.L.] to accuse [Guisao] so he knew what it was like." (Doc. 23-1 at 58) In the remaining thirteen affidavits (Doc. 23-1 at 60–72), family and friends state that Guisao and E.L.'s mother disliked each other, E.L.'s mother prohibited E.L. from visiting Guisao and Guisao's parents, and E.L. never complained about Guisao. (Doc. 23-1 at 60–72)

On December 3, 2012, Dr. Willey sent a summary of the nurse practitioner's trial testimony and a letter containing his opinion to post-conviction counsel. (Doc. 23-1 at 32) Dr. Willey was available to testify at the post-conviction evidentiary hearing in 2013. (Docs. 1 at 13, 4 at 3–4, and 23-1 at 25–32) Also, Laguna and the family and friends describe events that occurred before trial. (Doc. 23-1 at 57–58, 60, 62–72) Laguna states that she was available to testify at Guisao's trial in 2007. (Doc. 23-1 at 57) Consequently, the affidavits

15

by Dr. Willey, Laguna, and the family and friends are not "new" evidence and do not prove actual innocence. *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008) (holding that an affidavit did not contain "new" evidence because "it was always within the reach of Moore's personal knowledge or reasonable investigation"); *Goldblum v. Klem*, 510 F.3d 204, 226 n.14 (3d Cir. 2007) ("Evidence is not 'new' if it was available at trial, but a petitioner 'merely chose not to present it to the jury.'") (citation omitted).

Also, Dr. Willey's testimony would only impeach the nurse by rebutting her opinion about the frequency of injury to the anus after anal intercourse and by identifying deficiencies in the nurse's examination of E.L. Guisao speculates that a more thorough examination of E.L. would have revealed evidence that a sexual battery did not occur. Testimony by the family and friends would only impeach the credibility of both E.L. and her mother by establishing a motive for them to fabricate the accusation against Guisao. Neither speculative nor impeachment evidence demonstrates actual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992) ("This sort of latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of Shano's account of petitioner's actions."); *Moore*, 534 F.3d at 465 n.17 ("To show 'actual innocence,' as with showing 'actual prejudice,' requires something more than pointing to '[a] mere possibility of prejudice,' because a speculative claim 'will not satisfy the actual prejudice prong of the cause and prejudice test, *much less demonstrate actual innocence*.'") (citation omitted and italics in original).

A police report shows that in 2003, about two years before E.L. accused Guisao of sexual abuse, Guisao told E.L.'s mother that E.L. accused her stepfather of sexual abuse.

(Doc. 32-2 at 539, 542, 547) Guisao insisted that E.L.'s mother call the police but then stated that he wanted "to handle the situation like men." (Doc. 32-2 at 540, 547) E.L. denied to police that her stepfather had touched her genitals. (Doc. 32-2 at 538) E.L.'s mother told police that E.L. denied that anyone had touched her genitals. (Doc. 32-2 at 539) A nurse who examined E.L. did not observe bruising or trauma on E.L.'s vagina or anus. (Doc. 32-2 at 537) The prosecutor did not charge E.L.'s stepfather with a crime because of "insufficient evidence to successfully prosecute." (Doc. 32-2 at 544) Guisao attached these documents to his motion for post-conviction relief. (Doc. 32-2 at 531–50) In his motion, he asserted that trial counsel deficiently performed by not objecting to the prosecutor's motion to exclude evidence of the accusation against E.L.'s stepfather. (Doc. 32-2 at 525–26) Because Guisao knew about the accusation before trial, the accusation is not "new" evidence that demonstrates actual innocence. *Moore*, 534 F.3d at 465.

Lastly, Yaimi's affidavit arguably contains new evidence. (Docs. 23-1 at 54–55) However, Yaimi merely states that E.L. became fearful around her mother, her mother threatened and beat E.L. when E.L. mentioned Guisao, and her mother took E.L. to the courthouse to change her last name. (Doc. 23-1 at 54–55) At most, this evidence proves that E.L.'s mother disliked Guisao. *Sawyer*, 505 U.S. at 349. Also, E.L. told Yaimi that "when she was eighteen, she knew what she had to do, but didn't know how because she didn't want her [mother] to get in trouble." This ambiguous statement is not a recantation. As explained above, neither impeachment nor speculative evidence demonstrates actual innocence. *Sawyer*, 505 U.S. at 349; *Moore*, 534 F.3d at 465 n.17.

Evidence at trial proved E.L. immediately reported the sexual abuse to her mother, her mother reported the sexual abuse to police, and police collected from E.L. the panties

17

that she wore when the sexual abuse occurred. A DNA analyst discovered a sperm head on the inside crotch of E.L.'s panties. DNA testing revealed that eleven out of the twelve locations of the male DNA from the sperm head matched Guisao's DNA. Guisao does not present any evidence that refutes this compelling incriminating evidence.

"[C]onsider[ing] all the evidence, old and new, incriminating and exculpatory," Guisao fails to demonstrate actual innocence. *Rozzelle*, 672 F.3d at 1017. *Kuenzel v. Comm'r, Ala. Dep't Corrs.*, 690 F.3d 1311, 1318 (11th Cir. 2012) ("While the 'new evidence' Petitioner has offered might have strengthened Petitioner's defense if presented at trial, Petitioner has not offered sufficient 'new evidence' of the powerful kind that would individually or collectively 'show that it is *more likely than not* that *no reasonable juror* would have convicted him in the light of the new evidence.'") (quoting *Schlup*, 513 U.S. at 327) (italics in original).

Accordingly, Guisao's motion (Doc. 23) for relief is **DENIED**, and his motion (Doc. 26) for appointment of counsel is **DENIED** as moot. Because Guisao fails to demonstrate a "threshold showing of actual innocence," he is not entitled to an evidentiary hearing. *Sibley v. Culliver*, 377 F.3d 1196, 1206 (11th Cir. 2004). A certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on January 30, 2024.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE